1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

8

**EASTERN DISTRICT OF CALIFORNIA**

9
10

| | |
|---|---|
| C.A.R.V.,[1] | Case No. 1:25-CV-01395 JLT SKO |
| Petitioner, | ORDER CONVERTING THE MATTER TO A PRELIMINARY INJUNCTION AND GRANTING THE PRELIMINARY INJUNCTION IN PART AND REFERRING THE MATTER TO THE ASSIGNED MAGISTRATE JUDGE |
| v. | |
| MINGA WOFFORD, ET AL., | |
| Respondents. | |
| | (Doc. 2) |

## I.    INTRODUCTION

Before the Court for decision is C.A.R.V's request for a temporary restraining order (Doc. 2) filed in conjunction with his petition for a writ of habeas corpus brought under 28 U.S.C. § 2241 challenging his ongoing immigration detention. (Doc. 1.) Having evaluated the TRO request, Respondents' opposition (Doc. 9), C.A.R.V's reply (Doc. 10), and Respondents' supplemental filing alongside the entire record, the Court converts the matter into a motion for preliminary injunction, **GRANTS** that motion **IN PART**, and **REFERS** the matter to the assigned magistrate judge for a determination on the merits.

## II.    FACTUAL & PROCEDURAL BACKGROUND

---

[1] Respondents object to Petitioner proceeding by pseudonym (*see* Doc. 3), arguing that the procedure is not justified under the circumstances, particularly given Petitioner's "public criminal case proceedings." (Doc. 9 at 2, n. 2.) [1] Respondents also object to Petitioner naming multiple officials as Respondents in this matter. In the interest of expedience, the Court will defer determinations of these questions to the merits phase.

Petitioner is a citizen and national of Nicaragua who crossed the border into the United States in November 2021 at which time he was apprehended by the Department of Homeland Security (DHS). (Doc. 2-3, ¶9; Doc. 9-1, ¶ 6). According to the declaration of Deportation Officer Abad, Petitioner apparently admitted at that time to entering the United States unlawfully, though Respondents have failed to provide documents supporting that assertion. (Doc. 9-1, ¶ 5.) On December 6 or 7, 2021, DHS released Petitioner on his own recognizance. (Doc. 2-3, ¶ 13; Doc. 9-1, ¶ 7; Doc. 12-1 at 1.) The I-220A Petitioner signed upon his release imposed various conditions, including in person reporting and a requirement that Petitioner must not violate any local, State or Federal laws or ordinances. (Doc. 12-1 at 1.)

According to information relayed to the Court from Petitioner through counsel, after his release from DHS custody in 2021, C.A.R.V. came to live in the San Francisco Bay Area. (Doc. 1-2, ¶ 12.) He established a life in Daly City, California, and became engaged to a U.S. Citizen approximately six months before his most recent detention. (*Id.*) C.A.R.V. and K.M. are expecting a baby girl due in November of 2025. (*Id.*) They have a wedding currently scheduled for July 13, 2026, in San Mateo, California. (*Id.*) K.M. has submitted a letter describing their relationship, their plans, and the strain C.A.R.V.'s detention has caused as they prepare for the birth of their child. (*Id.* at 2. ("Rather than sharing in the happiness of getting ready to welcome our daughter, we are coping with the anxiety of not knowing what the future holds.").)

On April 20, 2023, C.A.R.V applied for asylum. ((Doc. 1-2, ¶ 14.) C.A.R.V. received employment authorization from DHS and is employed full time as a cook and food preparation specialist for a catering company. (*Id.* ¶ 13.) His employers and co-workers praise his work ethic and character. (Doc. 1-8 at 5–6, 9.) Relatives of his fiancé provide similar letters of support. (*Id.* at 3, 7–8.) Prior to his detention, his next scheduled hearing on his asylum application was scheduled for November 26, 2027. (*Id.*)

On June 10, 2023, Petitioner was arrested for violation of California Vehicle Code ("CVC") § 23152(a), Driving under the Influence ("DUI") of Alcohol; CVC § 23152(b), DUI Alcohol/0.08 percent or more; and CVC § 12500(a), Driving without a Valid License. (Doc. 9-1, ¶8.) Petitioner pled no contest to the CVC § 23152(b) charge (DUI Alcohol/0.08 percent or

1    more). (Doc. 2, ¶17.) On October 28, 2024, Petitioner was cited for violation of CVC § 2322(a)

2    Possession of Open container while driving. (Doc. 9-1, ¶9; Doc. 10 at 12.) Petitioner pled guilty

3    to the CVC § 2322(a) violation. (Doc. 10-2 at 2.)

4         On August 11, 2025, Petitioner reported to the ICE Field Office in San Francisco. (Doc 9-

5    1, ¶10.) After becoming aware of Petitioner's DUI arrest, ICE Enforcement and Removal

6    Operations (ERO) apparently instructed Petitioner to return on September 15, 2025, with relevant

7    court dispositions or police records for custody redetermination. (Doc. 9-1, ¶ 10; Doc. 2, ¶ 19.)

8    When Petitioner returned to the ICE Field Office on September 15, 2025, he purportedly admitted

9    to his DUI and open container convictions. (Doc. 9-1, ¶ 11) ICE then arrested Petitioner,

10   assertedly, for violating the conditions of his OREC release because of the state law/ordinance

11   violations. (Doc. 9-1, ¶ 11.) After detaining Petitioner, ICE transferred him to Mesa Verde where

12   he remains today. (Doc. 2, ¶ 20; Doc. 9-1, ¶ 12.)

13        On October 20, 2025, Petitioner filed both a petition for writ of habeas corpus (Doc. 1)

14   asserting that his detention violates his procedural and substantive due process rights under the

15   Fifth Amendment, as well as a motion for temporary restraining order requesting immediate

16   release and other injunctive relief. (Doc. 2.) On October 21, 2025, this Court entered a minute

17   order setting a briefing and hearing schedule. (Doc. 6.) In addition, this Court ordered

18   Respondents not to remove Petitioner from the United States nor transfer Petitioner out of the

19   Eastern District of California unless and until this Court orders otherwise. (*Id.*)

20        Respondents and Petitioner timely field their respective opposition (Doc. 9) and reply

21   (Doc. 10) briefs. In support of Respondents' arguments, they offer the Declaration of Officer

22   Abad, but he does not claim that he was present at the last interview—or any of the interviews or

23   hearings involving C.A.R.V.—and makes no showing how he knows what he purports to assert.

24   Due to the ambiguity in the declaration, the Court required Respondents to file the underlying

25   documents upon which the declaration relied. The order reads,

26        The Court requires additional details before it can evaluate the factual assertions
          made in Respondents' opposition (Doc. 9). Accordingly, as soon as possible but
27        **no later than noon TOMORROW**, October 30, 2025, Respondents **SHALL** file
          those portions of Petitioner's A File that support the assertions made in the
28        Declaration of Deportation Officer Abad (Doc. 9-1). In particular, Respondents

**SHALL** provide documentation detailing the nature of Petitioner's release on recognizance, any documents he signed in connection with that release, any notice provided to Petitioner in relation to the revocation of release, and any opportunity Petitioner was afforded (formal or informal) to contest the grounds for that revocation.

(Doc. 11) On October 30, 2025, Respondents filed only Petitioner's "Order of Release on Recognizance" dated November 24, 2021, and the "Continuation Page," and "Addendum attached to that order. Among other notable omission, Respondents did not provide any documents detailing the notice provided to Petitioner on August 11, 2025 that at the next interview he was subject to detention, no documents detailing any opportunity for him to contest revocation of his release, no documents detailing what occurred on September 15, 2025, and no arrest report (form I-213).

In the four-page production, the sole page that has any bearing on the issues raised in the motion/opposition has two pertinent entries: on August 15, 2025, the entry under the heading "Comments/Changes" reads, "O/R, EOIR 11/26/27, Bring court Dis/pp" and on September 15, 2025, as to which the "Comments/Changes" section is blank. Thus, key factual assertions made by Respondents are not supported by any supporting evidence and, the declaration fails to demonstrate Officer Abad's basis for personal knowledge for the facts claimed in it.[2,3] (Doc. 12.)

### III.    LEGAL BACKGROUND

**A.    Statutory Immigration Framework (8 U.S.C. § 1225 and § 1226)**

Two statutes govern the detention and removal of inadmissible noncitizens from the United States: 8 U.S.C. § 1226 and § 1225. In the interest of expedience, the Court relies here, as

---

[2] The declaration purports to rely on the declarant's "personal and professional knowledge, consultation with other DHS and ICE personnel, and reasonable review of official documents, systems, and records maintained by the agency and DHS, and other relevant sources during the regular course of my duties." **Even assuming the Federal Rules of Evidence don't apply, there is no showing as to what parts of the declaration were known to the declaration through his personal participation, which were gleaned through his professional knowledge, which were provided by other unnamed DHS and ICE staff, and which were supported by the "other sources" referenced, whatever may be. Had the government provided proper evidence, the outcome of this motion would likely be different.**

[3] Petitioner does the same. Though his attorney provides a declaration asserting that she has personal knowledge of the events set forth, she admits that she is merely relaying what Petitioner has told her. There may be some justification for doing this, given the circumstances, but the evidentiary infirmities exist even still.

1  relevant, on the legal background accurately presented by the district court in *Salcedo Aceros v.*

2  *Kaiser*, No. 25-CV-06924-EMC, 2025 WL 2637503 (N.D. Cal. Sept 12, 2025):

### A. Full Removal Proceedings and Discretionary Detention (§ 1226)

The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C. § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 524 (BIA 2011). Section § 1226 provides that while removal proceedings are pending, a noncitizen "may be arrested and detained" and that the government "may release the alien on ... conditional parole." § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country"). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* (citing 8 C.F.R. § 236.1(c)(8)).

"Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or her release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance. *See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

### B. Expedited Removal and Mandatory Detention (§ 1225)

While "§ 1226 applies to aliens already present in the United States," U.S. immigration law also "authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under § 1225, a noncitizen "who has not been admitted or who arrives in the United

States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225 authorizes "expedited removal." § 1225(b)(1). § 1225(b)(1) provides that:

> "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1) allows the Attorney General (who has since delegated the responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. The second group –designated noncitizens –includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,'" that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025). In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.* This was the status quo until January 2025, when the Department of Homeland Security revised its § 1225 designation to "apply

expedited removal to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation. In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

[Section] 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

## C. The Government's Recent Change in Position

Until this year, the DHS has applied § 1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation. This practice was codified by regulation. The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible

for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)) . . .

In 2025, however, the Government's policy changed dramatically. The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute*." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider ... whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." Dkt. No. 1 at ¶ 33. Officers are encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status." *Id.* The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner." Huffman Memorandum (Jan. 23, 2025).

Since mid-May of 2025, the Department of Homeland Security has made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the proceedings, and then re-arresting the individual in order to place them in expedited removal proceedings. Dkt. No. 1 at ¶¶ 35–40. If the immigration judge does not dismiss the full removal proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention provision.

*Salcedo Aceros*, 2025 WL 2637503 at *1-4 (internal footnotes omitted).

**B.    Parole Revocation**

In *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025), the court explained the parole process in immigration cases and noted that before parole may be revoked, the parolee must be given written notice of the impending revocation, which must include a cogent description of the reasons supporting the revocation decision. The court held:

Section 1182 . . . has a subsection titled "Temporary admission of nonimmigrants," which allows noncitizens, even those in required detention, to be "paroled" into the United States. This provision, at issue in this case, states:

The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this

8

title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and **when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.**

8 U.S.C. § 1182(d)(5)(A).

*Y-Z-H-L v Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under the Administrative Procedure Act, immigration parolees are entitled to determinations related to their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the agency fails to "articulate[] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. Parole revocations in the context of the INA must occur on a case-by-case basis and may occur "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id*. at *12 (quoting 8 C.F.R. § 212.5(e)). 8 C.F.R. § 212.5(e) requires written notice of the termination of parole except where the immigrant has departed or when the specified period of parole has expired.

Applying *Y-Z-H-L* and § 212.5(e), *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025), found that the INA requires a case-by-case analysis as to the decision to revoke humanitarian parole:

This Court agrees that both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole "must attend to the reasons an individual [noncitizen] received parole." *See id*. There is no indication in the record that the government conducted any such analysis here. On the contrary, the letter Mata Velasquez received merely stated summarily that DHS had "revoked [his] parole." Docket Item 62-1 at 5. Thus, there is no indication that—as required by the statute and regulations—an official with authority made a determination specific to Mata Velasquez that either "the purpose for

9

which [his] parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants [his] continued presence...in the United States." *See* 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated his rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the court reached a similar conclusion relying on the Due Process Clause:

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

## IV.    ANALYSIS

**A.    Jurisdiction**

    1.    <u>Habeas Corpus</u>

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts he is being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the

1    writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

2        C.A.R.V. seeks his immediate release from custody, which he contends violates the

3    Constitution of the United States. (*See* Doc. 1.) Thus, he properly invokes the Court's habeas

4    jurisdiction.

5        2.    Judicial Review under the INA

6        The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g), precludes

7    this Court from exercising jurisdiction over the executive's decision to "commence proceedings,

8    adjudicate cases, or execute removal orders against any alien," there is no removal order at issue

9    here and the central issue is Petitioner's continued detention. Thus, Court has the authority to

10   review the termination of C.A.R.V.'s release. *See Jennings v. Rodriguez*, 583 U.S. 281, 294

11   (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically

12   outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Comm.*, 525

13   U.S. 471, 482 (1999).

14   **B.    Preliminary Injunction**

15       The standard for issuing a TRO is the same as the standard for issuing a preliminary

16   injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir.

17   2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is

18   "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are

19   "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in

20   the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

21   "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

22   (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

23   test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

24   1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.

25   Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The

26   Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,

27   at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support

28   the issuance of a preliminary injunction where there are "serious questions on the merits … so

1    long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

2    injunction is in the public interest." *Id.* "A preliminary injunction is an extraordinary remedy

3    never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended to

4    "merely to preserve the relative positions of the parties until a trial on the merits can be held, and

5    to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S.

6    Ct. 659, 667 (2025) (citations omitted).

7         The status quo refers to "the last uncontested status which preceded the pending

8    controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

9    *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the

10   Court's view, that is the status before Petitioner was arrested. *See Kuzmenko v. Phillips,* No. 25-

11   CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining

12   order requiring immediate release of the petitioner back to home confinement from custody, as a

13   restoration of the status quo).

14        1.    <u>Likelihood of Success on the Merits</u>

15        This first factor "is the most important" under *Winter*, and "is especially important when a

16   plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

17   Cir. 2023). Petitioner contends that his re-detention and continued detainment violates due both

18   substantive and procedural due process. (*See generally* Doc. 2, ¶¶30–47.)

19        a.    *Respondents Rely on an Incorrect Interpretation of § 1225 for the*

20             *Authority to Detain Respondent*

21        Respondents maintain Petitioner's detention is "mandatory" under 1225(b) while his

22   removal proceedings are pending. (Doc. 9 at 3–5.) The various legal arguments relied upon by

23   DHS to support this assertion have been rejected by this Court in other proceedings. *See, e.g.*,

24   *Ortiz Donis v. Chestnut,* 1:25-CV-01228-JLT, 2025 WL 2879514 at *3–6 (E.D. Cal. Oct. 9,

25   2025). The government's recent interpretation of the relationship between § 1225 and § 1226 is

26   unfounded and detention is therefore not "mandatory" in this case, where petitioner has been

27   present in the United States for approximately four years and was released on his own

28   recognizance well before Respondents adopted the new interpretation of the governing statutes.

                    b.     *8 C.F.R. § 241.13 and § 241.4 Do Not Apply*

Respondents claim that "Petitioner's federal parole was revoked after prior notice for re-detention for cause" according to 8 C.F.R. § 241.13(i). (Doc. 9 at 2-3.) However, § 241.13 does not appear apply in this case because Petitioner lacks a final order of removal.[4] Respondents also mention 8 C.F.R. § 241.4, (Doc. 9 at 7), which also applies only to individuals subject to a final order of removal. As Respondents note, Petitioner is currently detained "pending immigration removal proceedings," (Doc. 9, 3), and he has a master calendar hearing scheduled for November 14, 2025 (Doc. 2 at ¶21.)

In addition, despite the claim that Petitioner was given notice that he would be subject to arrest at his next interview, he denies this, and the government provides no evidence that this occurred. Instead, they rely upon the August 15, 2015 entry made after his interview on that day, which reads, "O/R, EOIR 11/26/27, Bring court Dis¶¶." Respondents argue that this entry proves that Petitioner was given the notice required to satisfy due process. Despite lengthy argument on this topic, the Court has been provided no cogent explanation how this entry does what Respondents' claim. To the contrary, the entry seems to release Petitioner on his own recognizance despite knowledge that he had—or may have—been convicted of at least one violation of the law, provides him the next master calendar hearing date, and requires him to provide court records, likely concerning his criminal convictions. Through no tortured interpretation of this entry can the Court find that he was given any notice that a month into the future, he would face the possibility, let alone any probability, that he would be arrested. Thus, Respondents' claims contrary to this finding are flatly rejected.

                    c.    *Due Process Protections*

Petitioner contends that his continued detention violates his due process rights. (*See* Doc. 1, ¶¶ 72–82.) In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL

---

[4] 8 C.F.R. § 241.13 (a) states that "[t]his section establishes special review procedures for **those aliens who are subject to a final removal order** and are detained under the custody review procedures provided at § 241.4 after the expiration of the removal period, where the alien has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future." There is no documentation in the record to indicate that Petitioner is currently subject to a final order of removal; rather, Petitioner has a master calendar hearing scheduled for November 14, 2025. (Doc. 2 at ¶21.)

2084921, at *3 (N.D. Cal. July 24, 2025), the court held,

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals."). Even assuming Respondents are correct that § 1225(b) is the applicable detention authority for all "applicants for admission," Respondents fail to contend with the liberty interest created by the fact that the Petitioner in this case was released on recognizance in 2021, *prior to the manifestation of this interpretation*.

Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424 U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been applied to Petitioner are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL 2084921 at *3. In *Mathews*, the Court determined the following:

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

As to private interest, during his approximately four years on parole, C.A.R.V. obtained permission to work, pursued gainful employment, and built a relationship with his fiancé and many others in his community. Thus, parole allowed him to build a life outside detention, albeit under the terms of that parole. Petitioner has a substantial private interest in being out of custody and his detention denies him that liberty interest. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

The Court finds there is at least some risk of erroneous deprivation under the present circumstances. This record suggests that Petitioner violated the terms of his release, and he does not contest those violations. Thus, there appears to have been a change of circumstance warranting revocation of his parole. Even still, the remaining question is whether this change is sufficient to convince an IJ that detention is required based upon this change of circumstances. As argued by Petitioner, he was instructed in mid-August 2025 to return in September and to bring court records with him. He was not detained at that time despite reason to believe that the convictions had occurred. (*See* Doc. 1, ¶ 18 ("On August 19, 2025, nearly two years after his criminal arrest, C.A.R.V. presented himself for a scheduled check-in with ICE.28 At this appointment, an ICE officer told C.A.R.V. that they wanted to confirm his compliance with all orders regarding his 2023 arrest. Finding no reason to re-detain him, ICE scheduled him for another check-in on September 15, 2025.").) The Court does not know whether this means there was a finding of lack of risk at that time or if that determination was merely deferred. Unfortunately, based upon the failure of the government to provide the Court documentation of what occurred at that interview, the Court cannot state with certainty that these convictions suffered two years before, constitute changed circumstances sufficient to convince an IJ that detention is required.

The Supreme Court has held that "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). However, the Court also recognized that there may be situations that urgently require arrest, in which a prompt post-deprivation hearing is appropriate. *Id.* at 128

1    (noting there may be "special case[s]" where a pre-deprivation hearing is impracticable);

2    *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *9 (N.D. Cal. July 17,

3    2025) ("absent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due

4    process, particularly where an individual has been released on bond by an IJ"). The rapidly

5    developing caselaw on this subject gives limited guidance as to where this line should be drawn.

6    Some courts that have addressed detention-related habeas petitions brought by persons released

7    with enhanced supervision conditions have required pre-deprivation process, but in somewhat

8    different circumstances. In *E.A.T.-B. v. Wamsley*, No. C25-1192-KKE, 2025 WL 2402130, at *4

9    (W.D. Wash. Aug. 19, 2025), the district court ordered the release of a petitioner arrested by ICE

10   immediately after appearing in immigration court. That court agreed with the petitioner that ICE's

11   post hoc explanation that violations warranted his detention was pretextual, given that ICE first

12   became aware of petitioner's alleged violations a few hours before his immigration hearing, DHS

13   did not raise those violations at the hearing or argue the petitioner should be detained for any

14   reason, and the petitioner was then provided multiple, inconsistent justifications for his arrest. *Id*.

15   In *Arzate v. Andrews*, No. 1:25-CV-00942-KES-SKO (HC), 2025 WL 2230521, at *7 (E.D. Cal.

16   Aug. 4, 2025), converted to preliminary injunction sub nom, 2025 WL 2411010, at *1 (E.D. Cal.

17   Aug. 20, 2025), the court ordered immediate release of in immigration detainee who had been in

18   compliance with his conditions of release, even though he had incurred a misdemeanor arrest

19   while on parole, in part because no charges were ever filed.

20        In contrast, this Court ordered a bond hearing in *Martinez Hernandez v. Andrews*, No.

21   1:25-CV-01035 JLT HBK, 2025 WL 2495767 (E.D. Cal. Aug. 28, 2025), where the petitioner's

22   records indicated numerous violations. Though Martinez Hernandez offered explanations for the

23   violations and there was a dispute of fact as to whether the violations occurred, ICE's reliance

24   upon those violations was "not obviously pretextual." *Id*. at * 12 ("If Respondent's view of the

25   facts is correct, it is at least arguable that providing Petitioner with notice and a pre-deprivation

26   hearing would have been impracticable and/or would have motivated his flight."). As this Court

27   noted in *Martinez Hernandez*:

28        In similar circumstances, courts have refused to release the petitioners but

have ordered timely bond hearings. *Carballo v. Andrews*, No. 1:25-CV-00978-KES-EPG (HC), 2025 WL 2381464, at *8 (E.D. Cal. Aug. 15, 2025), citing *Perera v. Jennings*, et. al, No. 21-CV-04136-BLF, 2021 WL 2400981, at *5 (N.D. Cal. June 11, 2021); *Pham v. Becerra*, No. 23-CV-01288-CRB, 2023 WL 2744397, at *6 (N.D. Cal. Mar. 31, 2023). "[A]llowing a neutral arbiter to review the facts would significantly reduce the risk of erroneous deprivation." *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *8 (N.D. Cal. July 17, 2025). Thus, the Court concludes that prompt, post-deprivation process is required here.

*Id*. Finally, as other courts have done, the Court concludes that the government's interest in detaining Petitioner without proper process is slight. In sum, the Court concludes that he has demonstrated a likelihood of success on the merits on his procedural due process claim.

### C.  Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011) (the inability to pursue a petition for review may constitute irreparable harm). The Petitioner has established irreparable harm.

### D.  Balance of the Harms/Public Interest

Because the interest of the government is the interest of the public, the final two factors merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

> "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up) (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Without the requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-

Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, as mentioned, there appears to be no dispute that there is no evidence that Petitioner poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the equities and public interest weigh minimally in favor of Petitioner.

### E. Bond

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

### F. Burden of Proof

Petitioner requests that if the Court orders a bond hearing, the government should bear the

1   burden of proof. (*See* Doc. 10 at 17.) In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir.

2   2022), the Ninth Circuit considered whether a noncitizen detained under § 1226(a) pending

3   removal proceedings had a right to a second bond hearing where the government would have the

4   burden to establish by clear and convincing evidence that his continued detention was justified.

5   *Rodriguez Diaz* concluded that due process did not require that procedure, reasoning in part that:

> Nothing in this record suggests that placing the burden of proof on
> the government was constitutionally necessary to minimize the risk
> of error, much less that such burden shifting would be
> constitutionally necessary in all, most, or many cases. There is no
> reason to believe that, as a general proposition, the government will
> invariably have more evidence than the alien on most issues bearing
> on alleged lack of future dangerousness or flight risk.

10  *Id*. at 1212. However, *Rodriguez Diaz* "held only that a noncitizen detained under section 1226(a)

11  does not have a right to a second bond hearing when the only changed material condition since

12  their first bond hearing is the duration of their detention." *Pinchi*, 2025 WL 2084921, at *4. It did

13  not address the burden of proof applicable under the present circumstances.

14        *Pinchi* went on to discuss why the calculus changes for an individual who had been

15  paroled from immigration custody after their initial detention:

> Even assuming arguendo that the post-detention bond hearing
> provided under section 1226(a) provides constitutionally sufficient
> process for those noncitizens who have never previously been
> detained and released by DHS, [Petitioner's] circumstance is
> different. Her release from ICE custody after her initial
> apprehension reflected a determination by the government that she
> was neither a flight risk nor a danger to the community, and [she]
> has a strong interest in remaining at liberty unless she no longer
> meets those criteria. The regulations authorizing ICE to release a
> noncitizen from custody require that the noncitizen "demonstrate to
> the satisfaction of the officer that such release would not pose a
> danger to property or persons" and that the noncitizen is "likely to
> appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).
> Release [therefore] reflects a determination by the government that
> the noncitizen is not a danger to the community or a flight risk."
> *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017),
> aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir.
> 2018). [Petitioner] was apprehended by ICE officers when she
> crossed the border into the United States [ ]. ICE then released her
> on her own recognizance. As ICE was not authorized to release
> [her] if she was a danger to the community or a flight risk, the
> Court must infer from [her] release that ICE determined she was
> neither. [Her] release from ICE custody constituted an "implied
> promise" that her liberty would not be revoked unless she "failed to
> live up to the conditions of her release." *Morrissey*, 408 U.S. at 482.

19

> The regulatory framework makes clear that those conditions were that she remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

*Pinchi*, 2025 WL 2084921, at *4.

This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-detention is necessary to prevent danger to the community or flight. *Id*. at *7. Doing so is logical even for a post-detention custody hearing for the reasons articulated in *Pinchi*–namely that the immigrant's initial release reflected a determination by the government that the noncitizen is not a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention.

## V.     CONCLUSION AND ORDER

1.     Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a Motion for Preliminary Injunction, and it is **GRANTED in PART**.

2.     Petitioner **SHALL** be provided a *substantive* bond hearing **no later than November 14, 2025** at which the Immigration Judge will determine whether Petitioner poses a risk of flight or a danger to the community if he is released.

3.     At any such hearing, the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that Petitioner poses a danger to the community or a risk of flight, and Petitioner **SHALL** be allowed to have counsel present.

4.     The government may file a further brief on the merits of the habeas petition within 45 days. Alternatively, as soon as it can within that 30-day period, the government may file a notice that it does not intend to file further briefing. If the government files an additional brief, Petitioner may file a further brief within 30 days thereafter.

5.      The matter is referred to the assigned magistrate judge for consideration of the merits of the petition as quickly as possible.

IT IS SO ORDERED.

Dated:   **November 1, 2025**

UNITED STATES DISTRICT JUDGE